# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

GULL INDUSTRIES, INC.,

       Petitioner/Cross-Respondent,

       v.

GRANITE STATE INSURANCE COMPANY,

       Respondent/Cross-Petitioner,

ALLIANZ UNDERWRITERS INSURANCE COMPANY; AMERICAN ECONOMY INSURANCE COMPANY; AMERICAN STATES INSURANCE CO. (successor to WESTERN CASUALTY and SURETY COMPANY); CHICAGO INSURANCE COMPANY; COLUMBIA CASUALTY COMPANY; FEDERAL INSURANCE COMPANY; FIREMAN'S FUND INSURANCE COMPANY; GENERAL INSURANCE COMPANY OF AMERICA; INDIANA INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; OHIO CASUALTY INSURANCE COMPANY; PACIFIC INDEMNITY COMPANY; SAFECO INSURANCE COMPANY OF AMERICA; STATE FARM FIRE AND CASUALTY COMPANY; TIG INSURANCE COMPANY; UNITED STATES FIDELITY & GUARANTY COMPANY; WESTPORT INSURANCE CORPORATION; and ZURICH-AMERICAN INSURANCE COMPANY,

       Defendants.

DIVISION ONE

No. 78277-1-I

PUBLISHED OPINION

DWYER, J. — This complex environmental insurance coverage action began when Gull Industries, Inc. (Gull) filed suit for declaratory relief and related damages against a dozen insurance companies. Gull alleged that the insurers breached their obligations under primary and excess policies to provide coverage for environmental contamination liabilities at more than 200 retail gas stations (sites) it owned or operated during a period of nearly 50 years.

Over the course of nearly nine years of litigation and over 25,000 pages of filings, the trial court has made multiple rulings interpreting insurance coverage obligations, dismissed Gull's claims pertaining to 115 sites on summary adjudication, and found that one site triggered coverage following a bench trial on several bellwether "test" sites. Every insurer, except for Granite State Insurance Company (Granite State), has since settled with Gull or exhausted its policy limits. Granite State's coverage obligations remain unresolved on over 100 sites.

Before proceeding further on the remaining sites where factual issues prevent summary adjudication, the parties sought discretionary review of numerous issues that will influence or control the future course of this litigation. We accepted review. Now, for the reasons discussed below, we affirm some of the trial court's rulings and reverse others.

I

The core facts underlying this coverage action are largely undisputed. Between 1959 and 2005, Gull owned or operated approximately 220 retail gas stations throughout the Pacific Northwest. Gull also owned fuel tanker trucks and employed drivers to deliver gasoline to underground storage tanks at its sites.

A

Gull purchased multiple primary general liability, primary automobile liability, and excess umbrella liability policies during its years of operation.[1] Granite State provided Gull excess umbrella liability insurance from 1980 to 1983 under three consecutive policies. Each policy provided $15,000,000 in coverage per occurrence and in the aggregate.

The first Granite State policy, effective October 1, 1980 to October 1, 1981, was excess to insurance issued by The Home Insurance Company (Home). Home provided Gull comprehensive general liability (CGL) coverage for property damage with a per occurrence limit of $100,000 and business automobile liability (Auto Liability) coverage for property damage with a per occurrence limit of $100,000. Home also provided coverage for personal injuries, employer's liability, and miscellaneous liability.

Granite State's two other policies, effective October 1, 1981 to October 1, 1983, were excess to insurance afforded by Transamerica Insurance Group (TIG). TIG provided Gull primary CGL property damage coverage up to $100,000 per occurrence and Auto Liability property damage coverage up to $500,000 per occurrence.[2]

---

[1] A primary insurance policy provides "the first line of defense in the event of accident or injury." Safeco Ins. Co. of Ill. v. Auto. Club Ins. Co., 108 Wn. App. 468, 479, 31 P.3d 52 (2001). Excess or umbrella insurance policies, "which do not activate until a primary policy has been exhausted," are meant "to protect the insured in the event of a catastrophic loss in which liability damages exceed available primary coverage." Safeco, 108 Wn. App. at 479-80 (citing 15 LEE R. RUSS & THOMAS F. SAGALLA, COUCH ON INSURANCE 3D § 220:32 (2000)).

[2] Although not at issue here, the schedule of underlying insurance also contained coverages with distinct limits for (1) CGL bodily injury liability, (2) Auto Liability bodily injury, (3) Employer's Liability, and (4) Miscellaneous Liability.

The CGL and Auto Liability coverages provided by Home and TIG are reflected in the "Schedule of Underlying Insurance" on each corresponding Granite State excess policy. Gull's property damage insurance coverage is illustrated in the following table:

| Coverage Level | Companies on the Risk | | |
|---|---|---|---|
| | 1980-81 | 1981-82 | 1982-83 |
| **Excess** | Granite State $15,000,000 | Granite State $15,000,000 | Granite State $15,000,000 |
| **Primary** | Home $100,000 (CGL) $100,000 (Auto) | TIG $100,000 (CGL) $500,000 (Auto) | TIG $100,000 (CGL) $500,000 (Auto) |

B

Since at least 1984, Gull has been continuously investigating and remediating contaminated soil and groundwater at its sites. As is typical for gas stations operated decades ago, Gull claims, gasoline was released at its sites due to leaks from underground storage tanks, spills from customers over filling their vehicle gas tanks, and spills from the unloading of bulk fuel trucks. Consequently, many of its sites became demonstrably contaminated with petroleum and other hazardous substances.

Gull is jointly, severally, and strictly liable for remediating these sites under Washington's Model Toxics Control Act (MTCA), chapter 70.105D RCW,[3] and to third party claimants who share MTCA liability with Gull. "The primary intent of

___

[3] Effective June 2020, the legislature recodified chapter 70.105D RCW as chapter 70A.305 RCW, instructing that such changes "should be interpreted as technical in nature and not interpreted to have any substantive, policy implications." LAWS OF 2020, ch. 20, §§ 101-03. We refer to the former version, which was effective at the time of the proceedings herein.

MTCA is that '[p]olluters should pay to clean up their own mess.'" Pope Res., LP v. Dep't of Nat. Res., 190 Wn.2d 744, 751, 418 P.3d 90 (2018) (alteration in original) (quoting State of Washington Voter's Pamphlet, General Election 6 (Nov. 8, 1988)). "The provisions of [MTCA] are to be liberally construed to effectuate the policies and purposes of this act." Former RCW 70.105D.910 (1989). MTCA imposes joint and several liability on "current owners and operators of a facility, persons who owned or operated a facility at the time hazardous substances were disposed or released, and any other person who caused the disposal or release of the hazardous substance at any facility." Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wn.2d 654, 661, 15 P.3d 115 (2000); former RCW 70.105D.040(1)(b) (1989).

Gull asserted that it faces liability under MTCA because the releases at some sites resulted in third party property damage implicating Gull's primary CGL and Auto Liability coverages. Gull further alleged that it has been threatened with lawsuits at 15 sites, received cleanup notifications from regulatory agencies at 19 sites, and has been sued by third parties at 9 sites. MTCA contribution actions were filed by third parties against Gull concerning groundwater contamination at Station 269 (Lynnwood) and Station 272 (Seattle). Gull tendered its defense of these actions to primary insurer TIG under both the CGL and Auto Liability coverages. TIG agreed to defend Gull against these actions under its policies, subject to a full reservation of rights.

C

In December 2011, Gull filed this action against Granite State and 12 other insurance companies, seeking coverage for its environmental response costs at each of its current and former sites. Specifically, Gull sought (1) a declaratory judgment stating that the insurers are jointly and severally liable for all defense and indemnity costs to investigate and remediate groundwater contamination at all 220 sites, (2) damages for and interest on all costs incurred in connection with its liabilities, and (3) reasonable attorney fees and costs. It alleged that property damage occurred continuously at its sites throughout decades of insurance coverage, which triggered both CGL and Auto Liability policies in each year of coverage.

Given the number of insurers and sites involved in the case, the trial court adopted a phased approach to the litigation. Phase I focused on Gull's coverage claims in connection with five bellwether "Test Sites."[4] Phase I(a) was limited to insurance contract interpretation issues through summary judgment, while Phase I(b) addressed all remaining triable issues at a bench trial.

In April 2015, Gull moved for partial summary judgment seeking a ruling that Granite State's duty to indemnify is triggered upon the exhaustion of Gull's primary insurance immediately beneath the Granite State policy in the same policy period (vertical exhaustion). Granite State countered that its excess policy coverage is not triggered until all of Gull's "valid and collectible" underlying insurance is exhausted, regardless of the years in which those primary policies

---

[4] These test sites were: Station 220 (West Meeker), Station 224 (Sedro Woolley), Station 278 (Aurora Avenue), Station 611 (Omak), and Station 613 (Tonasket).

were issued (horizontal exhaustion).  The trial court denied Gull's motion, ruling

that horizontal exhaustion would apply to Granite State's coverage obligation:

> Granite State's "other insurance" clause also limits the
> Granite State policy to being "excess" to other valid and collectible
> insurance and provides that the policy "shall not contribute with
> other such insurance."  The policy does not limit itself to a particular
> year; indeed the "other insurance" clause refers to "any other
> insurer" without limitation.  In other words, Granite State has
> specifically limited its liability in the contract negotiated with Gull,
> both in the context of its definition of "ultimate net loss" and its
> reference to "other insurance."
>
> . . . The contract places limits on Granite State's liability in the face
> of its otherwise joint and several liability.  Such a limitation does not
> violate public policy or Washington law.

In July 2015, Granite State and TIG jointly moved for partial summary

judgment to dismiss Gull's claims as to 109 sites based on the "owned property

exclusions" (OPE) in the insurers' policies.  They argued that the OPE sites

should be dismissed because (1) there was no evidence of contamination or (2)

the contamination was limited to soil.  In an accompanying motion, TIG moved to

dismiss 128 "NCPD"[5] sites, arguing that there was no evidence of compensable

property damage (i.e., groundwater contamination above MTCA cleanup levels)

during its policy periods.

In response, pursuant to CR 41(a)(1)(B),[6]  Gull moved to voluntarily

dismiss without prejudice its claims for defense and indemnity at 75 sites.

Granite State and TIG opposed Gull's motion, referencing the time and effort

---

[5] The trial court and parties used the acronym "NCPD" to stand for "no compensable property damage."

[6] Under this rule, the trial court may dismiss any action "[u]pon motion of the plaintiff at any time before plaintiff rests at the conclusion of plaintiff's opening case" and such dismissal would be without prejudice unless otherwise noted.  CR 41(a)(1)(B), (a)(4).

they had already expended in preparing the summary judgment motions. Gull then moved to continue consideration of the insurers' motions, which the trial court granted. Gull then withdrew its CR 41(a)(1)(B) motion.

In September 2015, Granite State brought a motion for summary judgment seeking to dismiss Gull's claims at each of the five bellwether sites for failure to meet its burden of proof to trigger coverage of the excess policies. Relying on Puget Sound Energy v. Certain Underwriters at Lloyd's, London, 134 Wn. App. 228, 138 P.3d 1068 (2006) (PSE), for the proposition that "compensable property damage" requires proof of contamination to third party property exceeding MTCA cleanup levels during an insurer's policy period, Granite State argued that Gull had no such proof. Agreeing that there was no evidence of groundwater contamination at that time for Station 278 and Station 613, Gull did not oppose dismissal of those sites but claimed that issues of material fact remained for the other test sites.

The trial court granted Granite State's motion, concluded that the "legal standard" articulated in PSE, 134 Wn. App. at 253-54, "regarding necessary proof to show compensable damages applies to this case," and dismissed Gull's coverage claims for Stations 278 and 613.

At this point in the litigation, all but three of the defendant insurance companies had settled with Gull during Phase I(a) and two settled with Gull for purposes of Phase I(b), leaving Granite State as the only defendant at trial.

In November 2015, the bench trial commenced on the three remaining Phase I(b) bellwether sites: Station 220 (West Meeker), Station 224 (Sedro

8

Woolley), and Station 611 (Omak). Based on the evidence presented, the trial court found that Gull had proved that the groundwater at West Meeker was contaminated above MTCA cleanup levels during the Granite State policy years of 1980-1983, and that the policies for those years were triggered. The trial court also found that the evidence was insufficient to establish compensable third party property damage, exceeding MTCA cleanup levels, at the two other stations during the same period, thereby precluding coverage from Granite State for those sites.

In April 2016, the trial court entered an order determining Granite State's "attachment point"[7] for West Meeker. The court noted that, under its prior ruling on horizontal exhaustion, the "attachment points are cumulative where Gull is able to prove a covered occurrence under more than one Granite State excess policy." Thus, as to West Meeker, the trial court found that "the coverage afforded under the three Granite State excess policies is excess of a minimum of $1,600,000." It calculated this figure based on three unexhausted years of primary Auto Liability coverage from Home and TIG with per occurrence limits of $500,000 each year, and $100,000 of unexhausted primary CGL coverage from Home.[8]

---

[7] An "attachment point" is the level of loss at which an excess insurer's coverage obligation begins. RESTATEMENT OF THE LAW, LIABILITY INSURANCE § 39 cmt. d.

[8] Home became insolvent in 2003 and made no payments toward Gull's liabilities. The trial court's use of $500,000 as the limit of Home's Auto Liability coverage appears to be in error, as $100,000 is the correct amount of its limits of such coverage for property damage. This error went unnoticed by the parties in the trial court and in their briefing on appeal. It was raised by the court at oral argument. In the best tradition of the profession, Granite State's attorney confirmed the error in a letter to the court received by the court within two hours of the conclusion of argument.

This case is on interlocutory review. The discovery of this error may lead either or both of the parties to reexamine the issues in the case. In this opinion, we will address the issues in

9

In July 2016, Gull sought leave under CR 15(a)[9] to file a fourth amended complaint for the purpose of removing, without prejudice, 80 "Admitted sites" for which it admitted contamination had not yet risen above MTCA cleanup levels during the policy periods.  The trial court denied this request.

In August 2016, Granite State and other insurers renewed their previous summary judgment motions to dismiss the OPE and NCPD sites with prejudice.  The trial court granted the insurers' motions and entered orders dismissing a total of 115 sites (including 19 OPE sites, 23 NCPD sites, and 80 Admitted sites).

In March 2017, Gull and TIG entered a final settlement agreement that the trial court approved as reasonable.  Gull agreed "to resolve all policies of insurance of any kind whatsoever issued by TIG" in exchange for TIG's payment of $6,400,000.  Until then, TIG had been actively defending Gull in two pending claims seeking contribution from Gull for environmental cleanup costs at Station 269 and Station 272.  Based on this settlement, however, TIG withdrew its defense at these two sites.  Gull then tendered its defense of these claims to Granite State.

In July 2017, Granite State moved for partial summary judgment and sought a declaration that it had no duty to assume TIG's defense obligations for

---

accordance with the facts as they were understood by the parties upon filing their briefs.  But to be clear—no party has waived or forfeited any argument or claim arising from the discovery of the error discussed.  Nor does the law of the case doctrine—or any other principle of preclusion— prevent either party from bringing to the trial court's attention any argument or claim that is or was impacted by the error.

[9] After a responsive pleading has been filed, CR 15(a) requires a party to "amend the party's pleading only by leave of court or by written consent of the adverse party" and "leave shall be freely given when justice so requires."

Station 269, Station 272, or at any other site. The trial court granted Granite State's motion, ruling in pertinent part that,

> Gull's compromise settlement with TIG, and with its other primary insurers, does not shift the defense obligation to excess insurer Granite State.

> An excess insurer has no duty to defend unless and until the primary insurer has exhausted its obligation. The insured has the burden to prove exhaustion of its primary insurance coverage as a condition precedent to excess defense coverage. Gull has not shown all of its primary coverage to have been exhausted. Granite State's subordinate duty to defend remains on "standby."

Also in July 2017, Granite State unsuccessfully moved to dismiss this action without prejudice, arguing that no justiciable controversy remained between Gull and Granite State. The trial court denied the motion and ruled that "Gull's claim for declaratory judgment to establish [that] Granite [State] owes it a duty to defend and a duty to pay losses stemming from covered occurrences at enumerated former station sites . . . is a justiciable controversy."

Since this action was filed, Gull has received approximately $49 million in settlements and payments. Gull's remediation and investigation costs, as of August 2017, exceeded $17 million, its attorney fees and costs to pursue this action were about $14 million, and its unreimbursed defense costs as to all sites was around $274,000. Granite State's coverage obligations remain unresolved on over 100 sites.

D

In February 2018, Gull and Granite State sought and obtained from the trial court an order certifying questions of law for discretionary review in this court

11

pursuant to RAP 2.3(b)(4).[10]  In August 2018, the trial court revised its

certification order and a commissioner of this court granted discretionary review.

Having had the benefit of the parties' briefing and oral argument,[11] we now

address the numerous issues presented.[12]

II

In Washington, courts construe insurance policies as contracts, interpret

such policies as matters of law, and review them de novo.  Overton v. Consol.

Ins. Co., 145 Wn.2d 417, 424, 38 P.3d 322 (2002); Quadrant Corp. v. Am. States

Ins. Co., 154 Wn.2d 165, 171, 110 P.3d 733 (2005) (citing Weyerhaeuser, 142

Wn.2d at 665).  It is well settled that

> [a]n insurance policy is construed as a whole, with the policy being
> given a "fair, reasonable, and sensible construction as would be
> given to the contract by the average person purchasing insurance."
> If the language is clear and unambiguous, the court must enforce it
> as written and may not modify it or create ambiguity where none
> exists.  If the clause is ambiguous, however, extrinsic evidence of
> the intent of the parties may be relied upon to resolve the
> ambiguity.  Any ambiguities remaining after examining applicable
> extrinsic evidence are resolved against the drafter-insurer and in

---

[10] Under this rule, discretionary review may be accepted when
[t]he superior court has certified, or all the parties to the litigation have stipulated,
that the order involves a controlling question of law as to which there is
substantial ground for a difference of opinion and that immediate review of the
order may materially advance the ultimate termination of the litigation.
RAP 2.3(b)(4).

[11] After briefing and before oral argument, Gull filed a supplemental statement of
authorities citing to the California Supreme Court's recent decision in Montrose Chemical Corp. v.
Superior Court of Los Angeles County, 9 Cal. 5th 215, 460 P.3d 1201, 260 Cal. Rptr. 3d 822
(2020), as relevant authority regarding horizontal versus vertical exhaustion.  RAP 10.8 permits
parties to file statements of additional authorities, specifying that such a statement "should not
contain argument, but should identify the issue for which each authority is offered."  The purpose
of this rule is to provide parties with an opportunity to bring to the court's attention cases decided
after the parties submitted their briefs.
After oral argument, Granite State moved, under RAP 9.11, to supplement the record and
to allow supplemental briefing to address Montrose.  We granted the motion for supplemental
briefing but denied the request to supplement the record.  Both parties filed supplemental briefs.

[12] Although five certified questions were accepted for discretionary review, in our view
these questions raise several more issues that must be addressed to fully answer the questions
presented.

favor of the insured. A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable.

Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co., 134 Wn.2d 413, 427-28, 951 P.2d 250 (1998) (citations omitted).

III

The first issue we face is relatively straightforward. It is whether Gull met its burden to prove that the limits of TIG's underlying Auto Liability coverage have been exhausted as to all sites. Gull did not.

To obtain excess coverage, it is the insured's burden to prove that the underlying primary policies are exhausted. See McDonald v. State Farm Fire & Cas. Co., 119 Wn.2d 724, 731, 837 P.2d 1000 (1992) (insured has the burden to "show the loss falls within the scope of the policy's insured losses"); Rees v. Viking Ins. Co., 77 Wn. App. 716, 719, 892 P.2d 1128 (1995) ("An excess carrier's obligation to pay and defend begins when, and only when, the limits of the primary insurance policy are exhausted."); Quellos Grp., LLC v. Fed. Ins. Co., 177 Wn. App. 620, 634, 312 P.3d 734 (2013) ("The critical and distinctive feature of an excess insurance policy is that it provides coverage 'only after the primary coverage is exhausted.'" (quoting Diaz v. Nat'l Car Rental Sys., Inc., 143 Wn.2d 57, 62, 17 P.3d 603 (2001))).

Gull acknowledges that TIG's "underlying Auto coverage has not been exhausted"[13] and nothing in the voluminous record indicates otherwise. Gull clearly failed to satisfy its burden on this issue.

---

[13] Br. of Petitioner/Cross-Respondent at 23, 24-30.

13

IV

Gull contends that the trial court erred in ruling that it must exhaust all available primary coverage, for each year in which it was insured, before Granite State has any excess coverage obligations. This concept is referred to as horizontal exhaustion. As to its claim of error, Gull's argument is sound.

A

At the outset, the trial court correctly noted that no binding Washington authority "has directly decided the issue of horizontal versus vertical exhaustion for excess carriers when the underlying damages occur before, after and during the coverage carrier's excess policy," when an insured "attempts to collect from multiple primary [general liability] carriers that it maintains are jointly and severally liable for all damages during the coverage period." The California Supreme Court, however, recently resolved this very issue.

California courts interpret insurance policies under the same general rules of construction as do the courts of Washington. As the California Supreme Court explained:

> "The principles governing the interpretation of insurance policies in California are well settled. 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. "If contractual language is clear and explicit, it governs." If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect "'the objectively reasonable expectations of the insured.'"'" If these rules do not resolve an ambiguity, we may then "'resort to the rule that ambiguities are to be resolved against the insurer.'"

Montrose Chem. Corp. v. Superior Court of Los Angeles County, 9 Cal. 5th 215, 460 P.3d 1201, 1210, 260 Cal. Rptr. 3d 822 (2020) (citations omitted) (quoting

Minkler v. Safeco Ins. Co. of Am., 49 Cal. 4th 315, 232 P.3d 612, 617, 110 Cal. Rptr. 3d 612 (2010)).[14]  Satisfied that California and Washington courts similarly interpret and construe insurance policies, we now examine Montrose.

B

In Montrose, Montrose Chemical was sued for causing continuous environmental damage between 1947 and 1982.  460 P.3d at 1203.  "For each policy year from 1961 to 1985, Montrose had secured primary insurance and multiple layers of excess insurance" and Montrose sought to access this insurance to cover amounts it owed in connection with the environmental claims. Montrose, 460 P.3d at 1203.  The parties filed cross-motions for summary adjudication on whether vertical or horizontal exhaustion triggered access to multiple layers of excess liability coverage.  Montrose, 460 P.3d at 1205-06.  The trial court ruled that "the excess policies required horizontal exhaustion in the

---

[14] As discussed supra, Washington law regarding the interpretation of insurance contracts has been summarized by our Supreme Court.

> The criteria for interpreting insurance contracts in Washington are well settled.  We construe insurance policies as contracts.  Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wn.2d 654, 665, 15 P.3d 115 (2000).  We consider the policy as a whole, and we give it a "'"fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance."'"  Id. at 666 (quoting Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co., 134 Wn.2d 413, 427-28, 951 P.2d 250 (1998) (quoting Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wn.2d 618, 627, 881 P.2d 201 (1994))).  Most importantly, if the policy language is clear and unambiguous, we must enforce it as written; we may not modify it or create ambiguity where none exists.  See id.
>
> We will hold that a clause is ambiguous only "'when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable.'"  Id. (quoting B&L Trucking, 134 Wn.2d at 427-28).  If a clause is ambiguous, we may rely on extrinsic evidence of the intent of the parties to resolve the ambiguity.  Id. Any ambiguity remaining after examination of the applicable extrinsic evidence is resolved against the insurer and in favor of the insured.  Id. . . .  Finally, in Washington the expectations of the insured cannot override the plain language of the contract.  See Findlay [v. United Pac. Ins. Co.], 129 Wn.2d [368,] 378[, 917 P.2d 116 (1996)].

Quadrant Corp., 154 Wn.2d at 171-72.

context of this multiyear injury." Montrose, 460 P.3d at 1206. The California Court of Appeals affirmed this ruling in 2017. Montrose, 460 P.3d at 1206.

The California Supreme Court granted review to determine "whether vertical exhaustion or horizontal exhaustion is required when continuous injury occurs over the course of multiple policy periods for which an insured purchased multiple layers of excess insurance." Montrose, 460 P.3d at 1206. The parties' dispute centered on "the meaning of the 'other insurance' clauses in the excess insurance policies," which provided, "in a variety of ways, that each policy shall be excess to other insurance available to the insured, whether or not the other insurance is specifically listed in the policy's schedule of underlying insurance." Montrose, 460 P.3d at 1210.

The Montrose court noted that "[t]he 'other insurance' clauses at issue clearly require exhaustion of underlying insurance, but none clearly or explicitly states that Montrose must exhaust insurance with lower attachment points *purchased for different policy periods.*" 460 P.3d at 1210. It explained that, historically, ""other insurance" clauses were designed to prevent multiple recoveries when more than one policy provided coverage for a particular loss,'" Montrose, 460 P.3d at 1211 (quoting Dart Indus., Inc. v. Commercial Union Ins. Co., 28 Cal. 4th 1059, 52 P.3d 79, 93, 124 Cal. Rptr. 2d 142 (2002)), and that such clauses "have not generally been understood as dictating a particular exhaustion rule for policyholders seeking to access successive excess insurance policies in cases of long-tail injury." Montrose, 460 P.3d at 1211.

Montrose Chemical argued that the schedules of underlying insurance—all for the same policy period—referenced in the excess policies provided "a presumptively complete list of insurance coverage that must be exhausted before the excess policy may be accessed, with the 'other insurance' clauses serving as a backstop to prevent double recovery in the rare circumstance where underlying coverage changes after the excess policy is written." Montrose, 460 P.3d at 1212. The insurers countered, under a theory of horizontal exhaustion, that the underlying schedules represented "only a fraction—perhaps only a small fraction—of the insurance policies that must be exhausted before a given excess policy may be accessed." Montrose, 460 P.3d at 1212. Disagreeing with the insurers, the California Supreme Court held that access to the excess coverage was triggered upon vertical exhaustion, concluding:

> [T]he "other insurance" clauses do not clearly specify whether a rule of horizontal or vertical exhaustion applies here. Read in isolation, the "other insurance" clauses might plausibly be read to perform the function the insurers ascribe to them. But read in conjunction with the actual language of other provisions in the policies, and in light of their historical role of governing allocation between overlapping concurrent policies, the insurers' reading becomes less likely. Rather, in the absence of any more persuasive indication that the parties intended otherwise, the policies are most naturally read to mean that Montrose may access its excess insurance whenever it has exhausted the other directly underlying excess insurance policies that were purchased for the same policy period.

Montrose, 460 P.3d at 1212-13.

"Consideration of the parties' reasonable expectations," the Montrose court said, also "favors a rule of vertical exhaustion rather than horizontal exhaustion." 460 P.3d at 1213. To begin, it informed that "applying the

horizontal exhaustion rule would be far from straightforward," explaining that nothing "in the text of these [excess] policies tell us how an 'other insurance' clause in a policy from one period ought to apply to a policy from another period that contains both a lower attachment point and a higher coverage limit." Montrose, 460 P.3d at 1213.

From the insured's perspective, "because the exclusions, terms, and conditions may vary from one policy to another, a rule of horizontal exhaustion would create significant practical obstacles to securing indemnification" and "'would create as many layers of additional litigation as there are layers of policies.'" Montrose, 460 P.3d at 1213 (quoting Westport Ins. Corp. v. Appleton Papers Inc., 327 Wis. 2d 120, 787 N.W.2d 894, 918 (2010)). Moreover, "requiring a policyholder to litigate the terms and conditions of all policies with lower attachment points in every policy period before accessing policies with higher attachment points would effectively," the court noted, "increase the attachment point—thereby undermining the policyholder's reasonable expectation that coverage would be triggered upon the exhaustion of the amount listed as the policy's stated attachment point." Montrose, 460 P.3d at 1213. Thus, it reasoned, "[o]bjectively speaking, the parties could not have intended to require the insured to surmount all these hurdles before the insured may access the excess insurance it has paid for." Montrose, 460 P.3d at 1213.

Ultimately, the California Supreme Court concluded:

[I]n a case involving continuous injury, where all primary insurance has been exhausted, the policy language at issue here permits the insured to access any excess policy for indemnification during a

triggered policy period once the directly underlying excess insurance has been exhausted.

Montrose, 460 P.3d at 1215.[15]

In July 2020, a division of the California Court of Appeal analyzed and applied Montrose. See SantaFe Braun, Inc. v. Ins. Co. of N. Am., 52 Cal. App. 5th 19, 265 Cal. Rptr. 3d 692 (2020), review denied, No. S264060 (Cal. Sep. 30, 2020). There, the insured, SantaFe, filed a declaratory judgment action against its insurers to obtain coverage for asbestos-related claims under various excess liability insurance policies. SantaFe, 52 Cal. App. 5th at 21. The parties engaged in phased litigation lasting over 10 years. After determining that SantaFe failed to establish that it had horizontally exhausted its primary and certain layers of underlying excess insurance, the trial court granted summary judgment in favor of the excess insurers. SantaFe, 52 Cal. App. 5th at 21.

SantaFe appealed, arguing that "the [trial] court erred in interpreting the excess insurers' policies to require horizontal rather than vertical exhaustion." SantaFe, 52 Cal. App. 5th at 24. The SantaFe court observed that the Montrose decision "expressly leaves unanswered the question now before us," which was:

---

[15] The insurers argued that a rule of vertical exhaustion was unfair "because 'decades' worth of environmental damage [could] fall on the shoulders of disfavored insurers who happened to provide excess insurance . . . during that single unlucky year or two.'" Montrose, 460 P.3d at 1214 (alterations in original). But the California Supreme Court rejected this argument on several grounds. First, it said, there was "no evident unfairness to insurers when their insureds incur liabilities triggering indemnity coverage under the negotiated policy contract." Montrose, 460 P.3d at 1214. Second, it explained that "nothing about the rule of vertical exhaustion requires a single insurer to shoulder the burden of indemnification alone," because "insurers may seek contribution from other excess insurers also liable to the insured" and the "exhaustion rule does not alter the usual rules of equitable contribution between insurers." Montrose, 460 P.3d at 1214. Lastly, it distinguished a case upon which the insurers heavily relied, Community Redevelopment Agency v. Aetna Casualty & Surety Co., 50 Cal. App. 4th 329, 57 Cal. Rptr. 2d 755 (1996), clarifying: "This case, unlike Community Redevelopment, is not a contribution action between primary and excess insurers; it is, rather, a coverage dispute between excess insurers and their insured." Montrose, 460 P.3d at 1215.

> [W]hen the insured has incurred continuous losses extending over the coverage periods in multiple primary policies, whether all primary insurance covering all time periods must be exhausted ("horizontally") before the first level excess policies are triggered, or, as [SantaFe] contends, whether coverage under the excess policies is triggered once the directly underlying primary policies specified in each excess policy is exhausted ("vertically").

SantaFe, 52 Cal. App. 5th at 27.

The SantaFe court noted how the excess policies before it contained "comparable language to that interpreted in" Montrose and, pursuant thereto, "in the absence of explicit language to the contrary, [the policies] require the excess carriers to assume responsibility for defense and indemnity once the directly underlying primary policies have been exhausted." 52 Cal. App. 5th at 28-29. It then held "that (absent an explicit policy provision to the contrary) the insured becomes entitled to the coverage it purchased from the excess carriers once the primary policies specified in the excess policy have been exhausted." SantaFe, 52 Cal. App. 5th at 29.

The reasoning underlying the decisions in Montrose and SantaFe and the application of vertical exhaustion to continuous environmental or asbestos damage claims in those cases is sound and persuasive.[16] Additionally, Montrose's conclusions about the parties' reasonable expectations (e.g., once an

---

[16] In Cadet Manufacturing Co. v. American Insurance Co., 391 F. Supp. 2d 884 (W.D. Wash. 2005), United States District Judge Franklin Burgess, applying Washington law, declined to rule that horizontal exhaustion applied under either Washington law or an excess insurance policy issued by Granite State that was identical in all material respects to the policy here at issue.

> The Court is also unpersuaded by Granite State's proposal that the Court should require horizontal exhaustion of all primary insurers because to do so flies in the face of the terms of Granite State's own policies and Washington's law of joint and several liability among insurers of a continuous loss.

Cadet Mfg. Co., 391 F. Supp. 2d at 892.

underlying policy is exhausted, excess coverage will apply without the need to commence various declaratory actions concerning policies purchased before and after the policy at issue) supports the application of vertical exhaustion herein.[17]

Having so determined, we must nevertheless now review the language of Granite State's policies, which all contain identical terms and conditions, to determine if they clearly mandate something other than the application of vertical exhaustion.

C

A review of Granite State's policies reveals no explicit terms that require Gull to horizontally exhaust all of its underlying primary insurance as a condition of triggering excess coverage obligations. We begin with Granite State's "limit of liability" provision, which states:

> II. LIMIT OF LIABILITY. The Company shall only be liable for the ultimate net loss, the excess of either:
> (a) The limits of the underlying insurances as set out in the schedule in respect of each occurrence covered by said underlying insurances, or
> (b) the amount as set out in the declarations as the self-insured retention in respect of each occurrence not covered by said underlying insurances,
> (hereinafter called the "Underlying Limits"):
> and then only up to a further sum as stated in item 3(a) of the Declarations in all in respect of each occurrence, subject to a limit as stated in item 3(b) of the Declarations in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.
> In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurances by reason of losses paid thereunder, this policy shall

---

[17] We note that, at the time it ruled that horizontal exhaustion applied to the disputes herein, the trial court did not have the benefit of the Montrose and SantaFe decisions.

(1) In the event of reduction pay the excess of the reduced underlying limit

(2) In the event of exhaustion continue in force as underlying insurance, subject to all the terms and conditions of this policy.

The schedule of Underlying Limits sets forth the insurances directly under a given Granite State policy. For instance, the schedule for the October 1981 to October 1982 policy period identifies multiple TIG primary "policies" (i.e., CGL, Auto Liability, Employers Liability, and Miscellaneous Liability) that provide "coverages" for one or more types of liability (i.e., Bodily Injury Liability, Property Damage Liability, and Non-Owned Aircraft Liability), which have their own "limits" (i.e., $100,000, $500,000, and $5,000,000). This schedule does not identify any primary insurance policies purchased before 1981 or after 1982.[18]

Next, we review the "other insurance" condition in Granite State's policies, which reads:

> L. OTHER INSURANCE. If other valid and collectible insurance with any other insurer is available to the Assured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the Insurance afforded by this policy shall be excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this policy subject to the terms, conditions and limitations of other insurance.

This provision does not expressly *identify any other specific primary insurance* that Gull must exhaust in order to trigger Granite State's excess coverage.

Lastly, we look to the policies' definition of "ultimate net loss," which states:

> 6. ULTIMATE NET LOSS. The term "Ultimate Net Loss" shall mean the total sum which the Assured, or any company as his

---

[18] Similarly, the schedules underlying Granite State's two other policies do not identify any primary insurances purchased or applicable outside of those respective policy periods.

insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges, and all sums paid as salaries, wages, compensations, fees, charges and law costs, premiums on attachment or appeal bonds; interest, expenses for doctors, lawyers, nurses, investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured's or of any underlying insurer's permanent exployees [sic].

The Company shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance.

In sum, this clause simply says Granite State will not pay for expenses included in other "valid and collectible" insurance. But when looking at the policies as a whole, as we must do, the only valid and collectible insurances we see are those set forth in the schedules attached to each Granite State policy. This provision does not suggest that horizontal exhaustion is required herein.

We conclude that no provision in Granite State's policies expressly requires horizontal exhaustion of primary policies issued over a variety of policy periods.

Additionally, because a reasonable person would read Granite State's policies to mean that Gull may access excess coverage upon exhausting the schedule of underlying primary coverage during the same policy period, we conclude that the rule of vertical exhaustion applies to this case. Both the policy language and the principles explained in <u>Montrose</u> and <u>SantaFe</u> lead to this conclusion.[19]

---

[19] An evil inherent in application of horizontal exhaustion through a long series of primary policy periods was noted by the California appellate court. Where there is a continuing loss, multiple primary level policies with different coverage levels, and numerous excess policies with

D

In this case, the trial court arrived at an attachment point of $1,600,000 for the West Meeker site at the conclusion of the bellwether trial.[20] In so doing, it erred. For reasons we explain in the following sections, the trial court would have correctly arrived at a $600,000 attachment point.[21]

V

The parties do not dispute that TIG exhausted its $100,000 CGL policy limits. Given this, we are tasked with determining whether Granite State's excess coverage attaches as to all sites even though TIG's Auto Liability coverage was not exhausted as to all sites. The trial court ruled that it did not and we agree.

Gull claims that Granite State's excess coverage "attaches on a first-dollar basis above" TIG's exhausted CGL coverage. This is so, Gull argues, because its coverages for CGL and Auto Liability do not overlap and are capable of triggering coverage based on different "occurrences," or "accidents" (depending on the policy implicated). See Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha, 64 Wn. App. 838, 866 n.18, 827 P.2d 1024 (1992) (noting auto liability

different coverages, if "horizontal exhaustion of all primary insurance were required to trigger the coverage, the level of liability at which the excess coverage would attach would be unascertainable. . . . The difference between premiums paid for excess and for primary policies does not justify an interpretation that renders the point of attachment so unpredictable and unascertainable *when the policy is issued*." SantaFe, 52 Cal. App. 5th at 29 (emphasis added).

[20] While the parties hotly dispute the attachment point result reached by the trial court, neither party claims error in the court's decision to identify an attachment point or to the necessity for so doing.

[21] Our analysis of the attachment point is conducted in accordance with the observations set forth in note 8, supra.

insurance is in a separate category from comprehensive general liability insurance), aff'd, 126 Wn.2d 50, 882 P.2d 703, 891 P.2d 718 (1994).

Relying on Aetna Insurance Co. of Hartford v. Kent, 85 Wn.2d 942, 540 P.2d 1383 (1975), Gull contends its primary CGL and Auto Liability policies are mutually exclusive. The Aetna case concerned two policies of insurance, one for automobile liability and the other for contractor's (general) liability, written by the same insurance carrier. 85 Wn.2d at 943-44. The automobile policy covered liability "arising out of the ownership, maintenance or use, including loading and unloading, of any automobile," while the contractor's policy expressly did not cover liability "arising out of the ownership, maintenance, operation, use, loading or unloading of . . . any automobile." Aetna, 85 Wn.2d at 946 (italicization omitted). An accident occurred when a rock fell out of the contractor's truck due to improper loading. The insurer admitted coverage on the automobile liability policy but denied coverage under the contractor's policy, "claiming that to construe that policy as imposing coverage would constitute duplicate coverage never intended either by [the insurer] or by the insured." Aetna, 85 Wn.2d at 944-45.

Our Supreme Court agreed with the insurer's contention, holding that in view of the "virtually identical language" of each of the two policies, "the language evidences an intention that the automobile policy provide liability coverage of a kind the contractor's policy excludes." Aetna, 85 Wn.2d at 947.

As Gull correctly notes, its TIG Auto Liability policies provide coverage for "bodily injury or property damage to which this insurance applies, caused by an

accident and resulting from the ownership, maintenance or use of a covered auto." But Gull's TIG CGL policies expressly exclude from coverage:

> (g) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of
> (1) any automobile or aircraft owned or operated by or rented or loaned to any insured, or
> (2) any other automobile or aircraft operated by any person in the course of his employment by any insured.

Therefore, Gull concludes that a petroleum release from its driver's action in filling an underground storage tank from a tanker truck constitutes an "accident" triggering the Auto Liability policies, but a release from a leaking underground storage tank constitutes an occurrence triggering the CGL policies.[22] In essence, Gull argues that the two policies insure against different risks, that property damage in the form of pollution arises from both risks, that its primary coverage for property damage from the risk of leakage from tanks and pipes is exhausted, and that, therefore, Granite State's excess coverage as to that risk must be triggered.

A

Against this backdrop, Gull avers that the trial court mistakenly applied Granite State's "other insurance" provision to require exhaustion of TIG's Auto Liability coverage within a particular policy period. Gull asserts that the "other insurance" provision applies only when the coverage is concurrent and supports this assertion by citation to Devington Condominium Association v. Steadfast

---

[22] Gull also claims that the differing premiums it paid TIG ($9,864 CGL and $20,640 Auto Liability for 1982-83) for the coverages it received ($100,000 CGL and $500,000 Auto Liability) further demonstrate that the two coverages are mutually exclusive.

Insurance Co., No. C06-1213 MJP, 2007 WL 869954 (W.D. Wash. Mar. 20, 2007), a Western District of Washington federal court case in which a developer sued its contractor for defective construction.

In Devington, a contractor had three general liability insurers: the first issued a policy covering October 1998 to March 2000, the second provided coverage for the period of March 2000 to June 2001, and the third issued coverage from August 2001 to August 2003. 2007 WL 869954 at *1. One of the insurers moved for summary judgment and requested a ruling that the "other insurance" clause in its policy exempted it from coverage. Devington, 2007 WL 869954 at *1-2. The motion was denied.

In reaching this decision, after discussing relevant authorities, District Judge Marsha Pechman explained that some legal commentators have noted that

> "other insurance" clauses only apply in the context of concurrent policies because "while successive policies might insure the same type of risk, they do not insure the same risk" and because applying "other insurance" clauses to successive policies might make insurers liable for damages occurring outside their policy periods. DOUGLAS R. RICHMOND, ISSUES AND PROBLEMS IN "OTHER INSURANCE," MULTIPLE INSURANCE, AND SELF-INSURANCE, 22 PEPP. L. REV. 1373, 1376-77 (1995); see also 22 ERIC MILLS HOLMES, HOLMES' APPLEMAN ON INSURANCE 2D § 140.1[A] (1998) ("'Other insurance' refers to the existence of other insurers that insure the same risk, for the same benefit of the same entity, during the same period of time."); 3 LAW AND PRAC. OF INS. COVERAGE LITIG. § 38.2 (West 2006) ("To be deemed 'other insurance,' two or more policies must insure the same risk and the same interest over the same period of time."); 1 INSURANCE CLAIMS AND DISPUTES § 6.47 (West 2006) (noting that "other insurance" clauses should not apply to successive policies).

Devington, 2007 WL 869954 at *3. Judge Pechman then recognized that "other insurance" refers to other insurers that insure (1) the same risk (2) for the same entity (3) during the same period. Devington, 2007 WL 869954 at *3-4 (concluding "that 'other insurance' clauses do not apply where the at-issue policies provided consecutive rather than concurrent insurance coverage").

In reply, Granite State argues, and the trial court herein agreed, that Gull must exhaust the primary coverages for CGL and Auto Liability because Gull claimed that indivisible property damage was caused by its general and automobile operations, and, accordingly, claimed that both Gull and its insurers were jointly and severally liable for all remediation costs. For this reason, Granite State contends, Gull's primary CGL and Auto Liability policies covered the same risk.

The flaw in Granite State's position is that it conflates "risk" with the type of loss or damage that resulted. However, the terms "risk" and "loss" are not the same.

"The 'risk' covered by [a] policy is, in general, the category of loss the insurer agreed to provide cover under the terms of the policy." 7 LEE R. RUSS & THOMAS F. SAGALLA, COUCH ON INSURANCE 3D § 101:3 (2006). "Coverage for a particular activity ordinarily includes those *risks inherent in that activity* unless the risk is specifically excluded." 7 RUSS & SAGALLA, supra, § 101:6 (emphasis added). Hence, the definition of "loss," which is "[a]n undesirable outcome of a risk." BLACK'S LAW DICTIONARY 1132 (11th ed. 2019). A comparison of the two

terms supports the notion that "loss" is the product of a risk; it is not itself a risk.[23] The term "risk," unless otherwise defined, cannot be read to mean the loss that is generally at issue. We understand risk to mean the activities or events that give rise to a loss.

Applying that definition here, we view the "loss" at issue to be gasoline contamination and the "risk" giving rise to that loss as customer spills, employee delivery spills, and underground storage tank leaks. Because tank leakage was a risk insured under TIG's CGL policy and delivery spills were risks insured under its Auto Liability policy, those policies cannot be read to cover the same risk. In any event, the risks those policies insured against are not the loss that ultimately resulted (e.g., contamination).

At first blush, then, Gull appears to have a sound argument. Because the two underlying primary policies are triggered by different occurrences and insure against different risks, it seems to follow that the excess coverage should attach upon the exhaustion of either one, but not necessarily both, of the primary policies. And, if it was true that we look to the language of the underlying policies to answer this question, Gull would prevail.

B

However, we do not look to the language of the underlying policies to answer this question. Instead, when seeking to determine the obligations imposed by an excess insurance policy, we first look to the language of the

---

[23] Our discussion of "loss" herein is with regard to the issue presented and should not be read more broadly than that.

excess policy itself. And a review of the pertinent portions of the excess policies herein provides needed clarity.

Granite State agreed to insure Gull, but limited the amount of coverage available, as follows: for all sums which Gull "shall be obligated to pay by reason of the liability (a) imposed upon the Assured by law . . . for damages, direct or consequential, and expenses . . . on account of: (ii) Property Damage . . . caused by or arising out of each occurrence happening anywhere in the world." But Granite State limited the amount of insurance coverage available to Gull as follows:

> I. COVERAGE. The Company hereby agrees, according to the terms and conditions but subject to the limitations hereinafter mentioned, *to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability*
> (a) *imposed upon the Assured by law . . .*
> . . .
> for damages, direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss" on account of:
> . . .
> (ii) Property Damage,
> . . .
> *caused by or arising out of each occurrence happening anywhere in the world.*
> II. LIMIT OF LIABILITY. The Company shall only be liable for the ultimate net loss, the excess of . . .
> (a) The limits of the underlying insurances as set out in the schedule in respect of each occurrence covered by said underlying insurances, . . .
> . . .
> and then only up to a further sum as stated in item 3(a) of the Declarations in all in respect of each occurrence, subject to a limit as stated in item 3(b) of the Declarations in the aggregate for each annual period during the currency of this Policy . . . .
> . . .
> 5. OCCURRENCE. The term "Occurrence" wherever used herein shall mean an accident, or a happening, or event, *or a continuous or repeated exposure to conditions* which unexpectedly and unintentionally results in personal injury, property damage or

advertising liability during the policy period. *All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.*

(Emphasis added.)

Granite State's "limit of liability" provision is a statement of limitation. The policies plainly state that Granite State will be liable for "each occurrence covered by said underlying insurances." And then it sets forth the definition of occurrence that controls the excess policy.

Thus, an "occurrence" includes "a continuous or repeated exposure to conditions" which results in property damage to the property of another. However, all such exposure to conditions "existing at or emanating from one premises location shall be deemed one occurrence." Thus, the excess policy itself defines as one occurrence that which is two different risks where referenced in the underlying policies. Because the limits of the underlying policies that covered this occurrence have not been both exhausted as to all sites, Granite State's excess obligation is not triggered.

Gull's argument thus fails.

VI

Applying the principles discussed and conclusions reached to this point, the correct attachment point is $600,000. Because TIG's $100,000 CGL limits and $500,000 Auto Liability limits are the only underlying insurances implicated in this dispute, their combined limits of $600,000 is the amount at which Granite State's obligations commence.[24]

---

[24] Again, see note 8, <u>supra</u>.

31

The trial court found that Gull had incurred and paid $325,818, as of November 2015, in remediation costs at the West Meeker site. It also found that Gull would incur additional costs, explaining:

> Additional MTCA-required costs will be incurred at West Meeker in the future. [Washington's Department of] Ecology has not issued a "No Further Action" letter at West Meeker, and obtaining this documentation will itself require further expenditure. Additional remedial work remains to be done at the West Meeker [site] in order to achieve MTCA compliance.

Therefore, on remand the trial court must determine whether Gull's remediation costs incurred at the West Meeker site have reached the attachment point, thereby triggering Granite State's excess policy obligations.

VII

The next question to be addressed is whether the trial court correctly ruled that Granite State has no duty to defend Gull in the lawsuits brought against Gull by third parties arising out of property damage (pollution) caused to the property of those third parties, by Gull's actions, at Station 269 and Station 272. Our short answer is that these rulings will need to be revisited by the trial court on remand.

We have previously noted that the trial court correctly ruled that Gull had not shown that TIG's Auto Liability policy had been exhausted as to all sites referenced in the declaratory judgment complaint. Based on both this ruling and its application of horizontal exhaustion, the trial court subsequently ruled that this meant that Granite State's duty to defend had not been triggered at any site—

and thus Granite State had no duty to defend Gull in the litigation arising out of accidents at Station 269 or 272.[25]

To determine whether this ruling is necessarily correct, we must answer this question: Is it possible for Gull to establish that TIG's Auto Liability policy was exhausted as to a particular site in a particular policy period even though it could not establish that the same policy was exhausted as to all sites in all policy periods?  The answer is yes.

As previously discussed, Granite State's policy is triggered by exhaustion of the TIG CGL policy ($100,000) and payment of $500,000 by TIG (the limits of its Auto Liability policy).  This results in an attachment point (applying vertical exhaustion) of $600,000 in any policy period.  Once that attachment point is reached, Granite State's duties are clear.

It remains undisputed that TIG paid Gull $6,400,000 in exchange for a release of all claims against it.  Can the receipt of this $6,400,000 benefit Gull in its dispute with Granite State regarding Gull's assertions that Granite State has a duty to defend it in—for instance—the Station 269 litigation?  We believe it can.

To begin, it is clear that TIG's payment was made as a result of Gull having incurred legal liability as the result of property damage to the property of others arising out of an "accident" (in the language of the TIG Auto Liability policy) or "occurrence" (in the language of the Granite State excess policy) at (at least) some of the sites referenced in Gull's lawsuit against TIG (this lawsuit).

---

[25] In so ruling, it correctly rejected Gull's contention that it does not matter whether the TIG Auto Liability policy is exhausted, so long as the TIG CGL policy is exhausted (which all parties agree is the case).

Granite State appears to argue that—for any of the $6,400,000 paid by TIG to be applied to exhaust TIG's obligation at Station 269—Gull must be able to prove that it specifically contracted with TIG to so provide, or, put differently, that TIG's state of mind was that it was so doing. Not so. Expansive settlements are often the product of opposing parties agreeing on a settlement amount without agreeing as to the particular "value" of each component part of the various claims settled.

Here it is clear that the $6,400,000 payment meets most of the basics of the bargain Granite State struck when it sold the excess policy to Gull. There was a payment from the underlying insurances (the exhausted CGL insurance and the Auto Liability policy) in at least the amount of their respective policy limits (per site, in a policy period). The payments were the result of a legal liability incurred by Gull. That legal liability arose from an occurrence (as defined in Granite State's policy) during the policy period. Thus, if Gull can establish that at least $500,000 of the $6,400,000 was attributable to property damage arising from activity at Station 269, Granite State's policy obligations will be triggered because the situation will be that which it bargained for in its policy.

So, can Gull do so? We first address the significance of the mental state of TIG in making the payment to Gull. In this regard, Granite State has no enforceable interest in being treated well by either the underlying insurer or its insured. As was noted by United States District Judge Richard Jones in a similar dispute:

> Chartis [the excess insurer] complains that the settlement was the product of collusion for the purpose of triggering its duty to defend.

> There is no question that [the settling parties] colluded for this purpose . . . . But there is nothing presumptively improper about collusion for the purpose of obtaining insurance coverage.

Chartis Specialty Ins. Co. v. Queen Anne HS, LLC, 867 F. Supp. 2d 1111, 1122 (W.D. Wash. 2012) (applying Washington law).

Thus, had TIG been of a mindset to collude with Gull in order to trigger Granite State's excess policy obligations, Washington law would not stand in the way. And if the underlying insurer can act with such a collusive attitude toward excess coverage, it stands to reason that coverage can result even when the underlying insurer is of an agnostic mindset toward the question.

This makes sense. It is not the settling parties' subjective goals that control the excess insurer's obligation. Instead, it is the language of the excess policy.

> [T]he document that governs an excess insurer's duty is the excess policy itself. Weyerhaeuser, [142 Wn.2d at 690]. But excess insurance provides no greater license to deny a defense to an insured. An excess insurer must defend if an insured engages in conduct that conceivably triggers the defense obligation described in the excess policy.

Chartis, 867 F. Supp. 2d at 1121.

Had this dispute arisen solely as the result of the Station 269 plaintiff filing its complaint against Gull and Gull tendering defense to Granite State, no one would dispute that, had TIG paid both the $100,000 CGL limits and the $500,000 Auto Liability limits, Granite State would have a duty to defend. This would be true even if Gull did not immediately turn over the $600,000 to the plaintiff while the litigation remained ongoing. After all, by purchasing excess insurance from Granite State, Gull did not enter into a suicide pact. It need not fund its

35

opponent's litigation efforts as a condition of receiving the benefits of its Granite State policy.

What does this all mean?  On remand, if Gull can establish that it has allocated, dedicated, encumbered, and reserved $500,000 of the $6,400,000 paid by TIG to the Station 269 claim, it can put Granite State in the same position—with regard to Station 269—that it would be in had the Station 269 lawsuit been the only factor in this case.  By ensuring that Granite State is in that position, the attachment point is met and Granite State's duties are clear.[26]

At that point, the only remaining question is does the Station 269 plaintiff's complaint conceivably allege damages in excess of $600,000?  If so, Granite State's policy obligations are triggered.  Hayden v. Mut. of Enumclaw Ins. Co., 141 Wn.2d 55, 64, 1 P.3d 1167 (2000) (a duty to defend "exists merely if the complaint contains any factual allegations which could render the insurer liable to the insured under the policy" (citing Holland Am. Ins. Co. v. Nat'l Indem. Co., 75 Wn.2d 909, 912-13, 454 P.2d 383 (1969))); Chartis, 867 F. Supp. 2d at 1121.

What we have just discussed also holds true for the lawsuit arising out of activity at Station 272.  On remand, the trial court must revisit its analysis of these issues.[27]

---

[26] The attachment point being $600,000, that point is reached by combining the $100,000 CGL limit (that all parties agree has been exhausted) with $500,000 of Auto Liability payment from TIG.

[27] The trial court's reengagement with its rulings will not be constrained by CR 59 or any other state or local procedural rule.  Our purpose in accepting discretionary review of this case is to assist the trial court.  It should pay no heed to claims that any unreviewed rulings remain as the "law of the case" or any other such claim.  All of the trial court's rulings remain interlocutory, and thus subject to change.  The trial court has free rein to alter any ruling it has heretofore made as a result of the issuance of this opinion.

We granted review of the duty to defend question as to litigation only at Stations 269 and 272. Thus, we do not address any other site.[28, 29]

VIII

A

The next question is whether the trial court correctly ruled that, for the insurer to have liability in this MTCA-property-damage-to-third-parties lawsuit, the insured (Gull) was required to prove that property damage to the property of a third party took place during a Granite State policy period, and that such damage exceeded the MTCA mandatory cleanup level during the same policy period. In so ruling, the trial court followed a decision of our court which, in our view, is inconsistent with the language of pertinent Supreme Court decisions. Thus, we conclude that the trial court did not properly apply the law in this respect.

Before venturing into the case law, it is prudent to set forth the various scenarios that can arise in a continuous loss, liability only for damage to the property of others, pollution remediation, insurance dispute such as this. To illustrate, this case involves allegations of environmental property damage arising from three causes: (1) leaking underground gasoline tanks and pipes, (2) customers spilling gasoline when filling their tanks, and (3) employees spilling gasoline when refueling underground storage tanks.

Such spills or leakage can and did manifest itself in different degrees at different sites. Moreover, the causes of action that arise from damage to the

---

[28] Having said this, it stands to reason that Gull cannot allocate $500,000 of the TIG settlement amount to more than 12 sites. Having done so will leave only $400,000 remaining.
[29] The statement in note 28 is made in accordance with note 8.

property of third parties can be both statutory (i.e., MTCA) and common law

(trespass, nuisance, or negligence). Indeed, MTCA specifically provides that it

does not abrogate, supplant, or in any way alter common law claims:

> Nothing in [the MTCA] affects or modifies in any way any person's right to seek or obtain relief under other statutes or under common law, including but not limited to damages for injury or loss resulting from a release or threatened release of a hazardous substance.

Former RCW 70.105D.040(7) (2013).

What constitutes damage to the property of another? In this situation, it

means either damage to the real property owned by a third party or damage to

groundwater. "[G]roundwater belong[s] to the State of Washington, a third party,

under RCW 90.44.040 and article XXI, section 1 of our constitution." Olds-

Olympic, Inc. v. Commercial Union Ins. Co., 129 Wn.2d 464, 476, 918 P.2d 923

(1996) (footnote omitted).[30]

Thus, spilled or leaking gasoline can manifest itself (or not) in several

ways:

1. It may cause no damage to the insured's property or to the property of

others;

2. It may cause damage to the insured's property but no damage to the

property of others;

3. It may cause damage to the insured's property but no damage to the

property of others in the policy period;

---

[30] RCW 90.44.040 states in pertinent part that "all natural groundwaters of the state . . . are hereby declared to be public groundwaters and to belong to the public." WASH. CONST. art. XXI, § 1 provides: "The use of the waters of this state for irrigation, mining and manufacturing purposes shall be deemed a public use."

4. It may cause damage to the insured's property and cause slight damage (below MTCA mandatory cleanup levels) to the property of others during the policy period, with no evidence that the damage to third party property eventually met MTCA levels;

5. It may cause damage to the insured's property and slight damage to third party property (below MTCA levels) during the policy period, with evidence that the damage to the property of others *did* eventually meet MTCA levels; or

6. It may cause damage to the insured's property and damage to the property of others meeting MTCA levels during the policy period.

In the first scenario, there is no property damage and, thus, the insurer has no obligation to indemnify.

In the second scenario, there is no damage to the property of another and, thus, pursuant to the policy's owned property exclusion, the insurer incurs no obligation to indemnify.[31]

In the third example, there is no "occurrence," as defined by the Granite State policy, because there is no third party property damage during the policy period. Thus, the insurer has no obligation to indemnify.

In the fourth example, there is third party property damage during the policy period. Thus, there is an "occurrence," as defined in the Granite State

---

[31] Granite State's owned property exclusion clause states:
It is hereby understood and agreed that except to the extent that coverage is available to the assured in the underlying insurances as set out in the attached schedule (Form P433), this policy shall not apply to any liability for injury to or destruction of any property (including the loss of use thereof) leased by, rented to, used by or in the care, custody or control of the assured, their agents or sub-contractors, or to any property as to which the assured, their agents or sub-contractors are for any purpose exercising physical control.
(Capitalization omitted.)

policy. The insured could be liable in common law tort to the third party. The insurer would have an obligation to indemnify for that liability. But the owner would not yet have MTCA liability. Thus, the insurer would have no MTCA indemnification obligation.[32]

In the fifth example, there is third party property damage during the policy period and the damage ultimately reached MTCA levels. There is an "occurrence." The insured is liable for the continuing tort/continuing loss under MTCA. The insurer is obligated to indemnify.

In the sixth example, there is third party property damage reaching MTCA levels in the policy period. There is an "occurrence." The insured is liable under MTCA and the insurer is obligated to indemnify.

The superior court adopted and applied a view of the law that resulted in Granite State being responsible to Gull only in circumstances fitting the sixth example. We disagree, reverse the trial court's decision, and instruct the trial court to revisit all rulings made in reliance on that view of the law.

In the remainder of this section of our opinion, we explain our reasons for so ruling.

B

Again, we begin by examining the excess policy's language. Granite State promised to indemnify Gull for all sums Gull becomes legally obligated to

---

[32] A question of fact could be presented as to whether, pursuant to the evidence adduced, it was more likely than not that MTCA levels would ultimately be reached. This could impact the court's declaration of rights in a UDJA (Uniform Declaratory Judgments Act, chapter 7.24 RCW) action.

pay, up to the policy limits, due to third party property damage caused by an

"occurrence" as defined in the policy:

> I. COVERAGE. The Company hereby agrees, according to the terms and conditions but subject to the limitations hereinafter mentioned, *to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability*
>     (a) *imposed upon the Assured by law . . .*
>     . . .
> for damages, direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss" on account of:
>     . . .
>         (ii) Property Damage,
>     . . .
> *caused by or arising out of each occurrence happening anywhere in the world.*
>     . . .
>     3. PROPERTY DAMAGE. The term "Property Damage" wherever used shall mean (1) physical injury to or destruction of tangible property, which occurs during the policy period, including loss of use thereof at any time resulting therefrom; or (2) loss of use of tangible property, which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The policy does not indicate a specific amount of property damage that

Gull needs to establish before it can access Granite State's excess coverage.

Nor does the policy define "damages." But our Supreme Court has "explained

the term 'damages' in an insuring agreement refers to the cost of compensating a

claimant for damage done to the property," while the term "'[d]amage' means the

actual loss, injury, or deterioration of the property itself." Overton, 145 Wn.2d at

428 (citing Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wn.2d 869, 877, 784 P.2d

507 (1990); Am. Stevedores v. Porello, 330 U.S. 446, 450 n.6, 67 S. Ct. 847, 91

L. Ed. 1011 (1947)).

As to the controlling statute itself, MTCA imposes liability on the "owner or operator of the facility"[33] or "[a]ny person who owned or operated the facility at the time of disposal or release of the hazardous substances," but does not impose that liability directly on their insurers. Former RCW 70.105D.040(1) (2013). Each party liable under MTCA "is strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances." Former RCW 70.105D.040(2) (2013). Thus, each liable party is severally liable and jointly liable for remediating environmental property damage. This is so, regardless of whether the liable party contributed the first drop of pollutant, the last drop of pollutant, or the drop that caused the pollution to reach MTCA cleanup levels.

There is no dispute that Gull is legally obligated to clean up the property damage at its current and former contaminated sites. And, to the extent that any of the property damage for which Gull is jointly and severally liable resulted from an "occurrence" during Granite State's policy periods, Gull is entitled to coverage. "[A]ll insurers on the risk during the time of ongoing damage have a joint and several obligation to provide full coverage for all damages." B&L Trucking, 134 Wn.2d at 424. This is so because "the nature of liability imposed under environmental cleanup acts requires coverage—notwithstanding the extent of the insured's fault—as such statutes 'impose liability, often without fault, on polluters

---

[33] An "owner or operator" is "[a]ny person with any ownership interest in the facility or who exercises any control over the facility." Former RCW 70.105D.020(22)(a) (2013). A "facility" includes any "building," "equipment," "pipe or pipeline," "storage container," or "any site or area where a hazardous substance, other than a consumer product in consumer use, has been deposited, stored, disposed of, or placed, or otherwise come to be located." Former RCW 70.105D.020(8) (2013).

in order to safeguard society in general.'" Weyerhaeuser, 142 Wn.2d at 681 (quoting Weyerhaeuser Co. v. Aetna Cas. & Sur. Co., 123 Wn.2d 891, 909, 874 P.2d 142 (1994)).

At the time Granite State's policies were issued, of course, MTCA had not yet been enacted. So Gull could not have been found liable in 1982 or 1983 for MTCA damages.

However, Granite State's policy insured Gull against common law property damage claims during the policy period, such as trespass, nuisance, or negligence actions. See, e.g., Tiegs v. Boise Cascade Corp., 83 Wn. App. 411, 413, 922 P.2d 115 (1996) (pollution of groundwater, which was prohibited by statutes, gave rise to a nuisance action); Tiegs v. Watts, 135 Wn.2d 1, 4, 954 P.2d 877 (1998) (lead opinion by Smith, J.) (affirming verdict finding former landowners "liable for breach of a farm lease and for creating a nuisance by contaminating well water used for commercial farming").

Indeed, Gull's complaint for declaratory relief does not seek a declaration of coverage based solely on MTCA liability. To the contrary, it alleges more generally that "[c]ompensable and covered damage to property at each of the [s]ites, in the form of environmental contamination to the soil and groundwater, occurred during the periods of the [p]olicies."

Hence, from our reading of Granite State's policies and of Gull's complaint, we see no requirement that Gull establish a certain amount or level of "property damage" before coverage is implicated. Instead, any amount of third party property damage, no matter how small, that is the result of an "occurrence"

43

during the policy period is sufficient to trigger coverage. See Boeing, 113 Wn.2d at 886 ("The occurrence of the hazardous wastes leaking into the ground contaminating the groundwater, aquifer and adjoining property constituted 'property damage' and thus triggered the 'damages' provision of the policies."); B&L Trucking, 134 Wn.2d at 425 (when damage, even if minute, occurs during a policy period that policy is triggered). It is the "occurrence" that is tied to the policy period—not the determination of the extent of damages owed or even the theory of legal liability employed by the third party claimant.

C

Granite State argues to the contrary, justifiably asserting that a jury instruction referenced in PSE, 134 Wn. App. at 253, correctly states the law as to when property damage is compensable under MTCA. The trial court agreed and applied the wording of that instruction as the law of this case. However, for a variety of reasons that we now discuss, the instruction at issue in PSE did not correctly state the law.

The PSE opinion concerned a multi-year environmental insurance coverage action filed by Puget Sound Energy (PSE) against multiple insurance companies to recover cleanup costs at three sites. 134 Wn. App. at 232. Given the complexity of the issues therein, the litigation was split into three phases. Phase II asked a jury to determine: "(1) Whether or not there is coverage under any policies at issue as to each site; and (2) If any coverage is found under any policies, the trier of fact will determine the amount of damages plaintiff is entitled

to recover as to each site." PSE, 134 Wn. App. at 232-33. At the conclusion of

Phase II,

> the jury returned special verdicts with regard to the three sites. With regard to the Buckley Headworks and Shuffleton Steam Plant sites, the jury found that groundwater property damage did not occur at those sites during the policy periods in question. Thus, [the insurer] was not liable to cover Puget's remediation costs for those sites. However, the jury found that groundwater property damage occurred at the Grady Way site during the policy periods in question.

PSE, 134 Wn. App. at 235-36.

Following later proceedings and the completion of Phase III, the insurer

appealed on several grounds. PSE cross-appealed, claiming that Phase II's jury

instruction 13 was erroneous. PSE, 134 Wn. App. at 238, 253. Instruction 13

stated:

> "In order to establish that it caused compensable property damage to groundwater, Puget Power must prove by a preponderance of the evidence that it contaminated groundwater, and that during the policy periods the contamination exceeded the levels mandated for cleanup or remediation under the Washington State Model Toxics Control Act [(MTCA)].
>
> Puget Power must also prove by a preponderance of the evidence that the claimed costs were incurred because there was compensable damage to groundwater."

PSE, 134 Wn. App. at 253 (alteration in original). On appeal, as we explained,

"[f]or strategic reasons, P[SE] raise[d] this issue only with regards to the Buckley

Headworks verdict." PSE, 134 Wn. App. at 253.

As to the cross-appeal, we deemed jury instruction 13 to be a correct

statement of the law because,

> in order for London's policies to have been triggered, there must have been "compensable damage" or "a covered injury or loss"

> during the policy periods. Under the terms of London's insurance policies, compensable damage is damage that the policyholder is legally obligated to pay. Under the MTCA, a property owner is legally liable for third party property damage only when contamination exceeds the limits set forth in the MTCA. For Puget to be legally liable under the MTCA for groundwater contamination during the policy periods in question, it must be proven that the alleged contamination exceeded MTCA levels during those policy periods. If an MTCA exceedance is not proved during the periods of London's coverage, there is no compensable property damage under the MTCA during those periods and London's policies are not triggered. Jury instruction 13 was not erroneous.

PSE, 134 Wn. App. at 253-54 (footnotes omitted). But in reaching this conclusion, we misapplied the rule announced in Villella v. Public Employees Mutual Insurance Co., 106 Wn.2d 806, 725 P.2d 957 (1986), the sole authority upon which the statement was based and the sole authority cited by us in this section of the opinion.

Villella involved a *claim of continuous loss* that, in fact, *was not* a continuous loss. There, an insured homeowner purchased a new home in 1979. Villella, 106 Wn.2d at 808. By 1983, the foundation on one side of the house sank eight inches. The homeowner sought recovery for damage to the home under insurance policies in effect between 1979 and 1982, arguing that the builder "had negligently failed to install a proper drainage system, and that this negligence set in motion a continuous process of soil destabilization which eventually resulted in the inability of the soil under his house to sustain the foundation or the house itself." Villella, 106 Wn.2d at 808-09. This argument was rejected by our Supreme Court, which reasoned that

> [t]here was no "continuing process" of *damage* to the plaintiff's residence. The residence itself sustained no damage prior to November 20, 1983. Consequently there was no damage to the

46

house during the period of October 25, 1979 to August 26, 1982, when the homeowners policy was in effect. Mr. Villella could not have filed a claim during the policy period, as the Gruol[34] plaintiff could have done, because there was no compensable damage during the policy period.

Villella, 106 Wn.2d at 811-12.[35]

Then, in its discussion regarding the requirement that property damage occur during the policy period to trigger coverage, the Supreme Court observed that "when courts are dealing with property damage situations where damages slowly accumulate, courts have generally applied the exposure theory. S*o long as there is tangible damage*, even if minute, courts have allowed coverage from that time." Villella, 106 Wn.2d at 814 (quoting Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1222 n.18 (6th Cir. 1980)). The Supreme Court then held that, to trigger coverage, an insured must have sustained "a covered injury or loss, *however minute*, during the effective period of the policy." Villella, 106 Wn.2d at 814 (emphasis added). But, in that case, "Villella simply did not sustain a covered loss during the coverage period of [the] policy." Villella, 106 Wn.2d at 814.

In PSE, however, we misunderstood Villella to mean that a particular level of damage was required within a policy period. Villella clearly does not support

---

[34] Gruol Constr. Co. v. Ins. Co. of N. Am., 11 Wn. App. 632, 524 P.2d 427 (1974).

[35] Immediately before this explanation, the Villella court distinguished Villella's case, both factually and legally, from that of Gruol. It said: "Gruol involved an undiscovered, progressively worsening condition of dry rot. The actual damage to the building was initiated at the time of construction and continued throughout the time that each of the three insurers provided coverage." Villella, 106 Wn.2d at 811. Further, "[t]he *damage* to the structure was a continuous process which increased with time," "the structure was damaged by dry rot during each policy period," and "[i]f at any point the dry rot had been discovered, the insured could have forced the insurer to pay for the damages." Villella, 106 Wn.2d at 811. Thus, Gruol involved an "occurrence" happening during the policy period (property damage). Villella, however, involved no property damage during the policy period and, hence, no "occurrence."

47

that proposition. This error on our part is further illustrated by B&L Trucking, in which our Supreme Court clarified its Villella decision:

> We held there was no continuing process of damage to the residence, the policy required that damage occur during the policy period, and, therefore, the policy did not cover the damage. . . . [W]e noted that . . . coverage under the occurrence clause requires the insured to sustain damage during the effective period of the policy. Villella, 106 Wn.2d at 814. In other words, when damage occurs during a policy period, that policy is triggered.
>
> . . . Hence, in Villella, we accepted that when damage is continuing, all triggered policies provide full coverage.

B&L Trucking, 134 Wn.2d at 425; see also Seattle City Light v. Dep't of Transp., 98 Wn. App. 165, 172, 989 P.2d 1164 (1999) ("no minimum level of 'hazardous substance' is required to trigger MTCA liability"); PacifiCorp Envtl. Remediation Co. v. Dep't of Transp., 162 Wn. App. 627, 658, 259 P.3d 1115 (2011) (explaining that if the evidence shows that a hazardous substance "had *some* effect (no matter how small)" on contamination levels, "then DOT [the Department of Transportation] is liable under the MTCA, provided DOT falls within a definition of an applicable liability provision").

We note that our PSE decision was originally an unpublished opinion, consisting of 44 paragraphs, of which 41 were devoted to other issues.[36] In fact, the three-paragraph discussion of the MTCA cleanup level therein was dicta. We say this because the record reveals that the trial court properly instructed the jury in instruction 12, which said:

> Property damage is harm or injury to or destruction of property owned by third parties. The State of Washington owns all groundwater in the state. Property damage includes harm or injury to groundwater by the presence in the groundwater of hazardous or

---

[36] In briefing, the parties invited us to examine the record in PSE. We have done so.

toxic substances as defined in these instructions. You must determine if property damage occurred and if so, when such property damage first occurred and over what period of time such property damage continued.

When property damage first occurred and over what period of time *property damage* continued *can be determined without reference to any specific quantity of property damage. Any damage, however minute, is sufficient.*

(Emphasis added.)

The PSE jury was also given an interrogatory which asked: "Did groundwater property damage occur at the Buckley Headworks site during the following policy periods: [listing 23 policy periods between June 1939 and April 1965]." The jury answered "no." Given this finding, it is plain that the jury never considered the question of whether the damage it found was compensable property damage, as defined in instruction 13. Having found no damage at all, as defined in instruction 12, the jury did not continue on to the question of whether the property damage was compensable. Thus, PSE's cross-appeal should have been summarily rejected on the basis that the jury never considered instruction 13.

For the reasons stated above, it was wrong for PSE to suggest that a landowner's insurer is not responsible for cleanup damages simply because the property damage had not exceeded MTCA cleanup levels during the policy period. The landowner is liable when damage to third party property first takes place—at the first drop of contaminant. Later, when the contamination reaches MTCA levels, the landowner is jointly and severally liable for all remediation costs.

Because the first drop of contaminant constitutes property damage to the property of another, there is an "occurrence" during the policy period. This triggers policy coverage. That the scope or extent of the "damages" for which the landowner is ultimately responsible cannot be determined within the policy period is of no moment. When there is an "occurrence" within the policy period, the fact of the landowner's liability is fixed, as is the obligation of the insurer.[37] Only the extent of the liability remains to be determined. That what began as tort liability only later became MTCA liability does not alter the insurer's responsibility to indemnify for "all sums" owed.

As was ably expressed:

> Insureds are not purchasing "almost comprehensive" coverage. CGL policies[38] are marketed by insurers as comprehensive in their scope and should be strictly construed when the insurer attempts to subtract from the comprehensive scope of its undertaking.

Olds-Olympic, 129 Wn.2d at 471.

As explained herein, we misspoke in PSE. On remand, the trial court must revisit its rulings made in reliance on our error and apply the law as our Supreme Court has deemed it to be.

IX

With this holding in mind, we now address the trial court's summary judgment rulings dismissing the NCPD sites, Admitted sites, and OPE sites.

---

[37] Indeed, MTCA was not enacted until 1989. MTCA liability in 1982 or 1983, when the insured "occurrences" took place, could not then have been proved. That such a theory of liability came into being after the policy period does not annul the duties to indemnify or cover.

[38] Granite State's policy is in excess to both TIG's CGL and Auto Liability policies.

We review summary judgment orders de novo and engage in the same inquiry as the trial court. Youngblood v. Schireman, 53 Wn. App. 95, 99, 765 P.2d 1312 (1988). Summary judgment is appropriate if "there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014) (citing CR 56(c)). A material fact is one upon which the outcome of the litigation depends. Greater Harbor 2000 v. City of Seattle, 132 Wn.2d 267, 279, 937 P.2d 1082 (1997). We view all facts submitted and the reasonable inferences therefrom in the light most favorable to the nonmoving party. Greater Harbor 2000, 132 Wn.2d at 279.

A

We first address the NCPD sites (the sites where there was evidence of contamination of third party property taking place during the policy periods but not evidence that the contamination had reached MTCA mandatory remediation levels during the same periods). Did the trial court err by granting summary judgment in favor of Granite State and dismissing with prejudice Gull's claim for coverage relating to those sites? We conclude that it did.

Granite State moved for partial summary judgment seeking to dismiss the claims arising from all such sites. Relying on PSE, it argued: "Where the contamination at a particular site did not exceed the minimum clean-up regulated limits set forth by the state during the policy period, Gull is not legally obligated for the alleged contamination and therefore, there can be no compensable property damage under the policies." The trial court accepted this premise and

granted Granite State's motion, thus dismissing 23 NCPD sites. For the reasons previously discussed, the trial court thus applied the wrong legal standard in making its rulings.

Because the wrong legal standard was applied, we reverse the trial court's entry of partial summary judgment.

B

Gull admitted that it had no evidence of contamination to third party property during the policy period at some sites and no evidence of such damage exceeding MTCA cleanup levels at others. We next review the trial court's ruling entering partial summary judgment for Granite State at these sites.

1.

As to the sites at which no property damage to the property of others was shown, we affirm the trial court's ruling. Given the absence of property damage, no "occurrence," as defined in the excess policy, had been proved. Thus, coverage had never been triggered.

In addition, based on the factual record herein, the evidence was that where property damage had not yet taken place, at this late date it was unlikely to do so.

Moreover, the trial court based its decision on two other considerations: (1) the length of time that this litigation had been ongoing, and (2) the fact that it had been over a year (prior to its ruling) since Granite State had first noted its motion. Thus, the trial court ruled, Gull had ample time to produce any evidence that it could produce.

Because no "occurrence" was proved to have taken place, the motion to dismiss was properly granted.

Because of the length of time that had elapsed in the litigation and since the motion was first noted, the trial court did not abuse its discretion by making the dismissal with prejudice.[39] See Vallandigham v. Clover Park Sch. Dist. No. 400, 154 Wn.2d 16, 26, 109 P.3d 805 (2005) (summary judgment is proper where the nonmoving party fails to "'present evidence that demonstrates that material facts are in dispute'" (quoting Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wn.2d 506, 515-16, 799 P.2d 250 (1990))).

2.

We next turn to those claims arising out of sites at which there is evidence that property damage to the property of others was caused during the policy periods. We reverse the trial court's dismissal of these claims. The damage to the property of others established a common law tort (trespass, nuisance, or

---

[39] Gull also contends that the trial court erred by denying its motion for leave to file a fourth amended complaint, which sought to remove all of the Admitted sites from this litigation *without prejudice*. We disagree. Pursuant to CR 15(a), a party may amend a pleading once as a matter of course at any time before service of a responsive pleading, but thereafter "only by leave of court or by written consent of the adverse party." Such leave should be freely given and denied only when delay, dilatory practice, or prejudice to the nonmoving party are shown. Tagliani v. Colwell, 10 Wn. App. 227, 234, 517 P.2d 207 (1973). A trial court's refusal to grant leave to amend a complaint will not be disturbed on appeal unless the decision was a manifest abuse of discretion. Haselwood v. Bremerton Ice Arena, Inc., 137 Wn. App. 872, 889, 155 P.3d 952 (2007), aff'd, 166 Wn.2d 489, 210 P.3d 308 (2009). A trial court abuses its discretion when its decision rests on untenable grounds or is made for untenable reasons. Haselwood, 137 Wn. App. at 889.

In denying Gull's motion, the trial court ruled that "dismissal of these sites, at this stage of litigation would unduly prejudice defendants" and that the "investment of time, money and resources into defending against these claims—some five years after this lawsuit was filed— would be completely wasted if dismissed now." We cannot say that no reasonable judge would rule as the trial court herein ruled, nor can we say that all reasonable judges would have ruled in accordance with Gull's desired ruling. Neither can we say that the judge's ruling was based on untenable grounds. Thus, no abuse of discretion has been demonstrated. There was no error. We affirm the trial court's denial of Gull's CR 15(a) motion.

negligence) and resulted in there being an "occurrence," within the meaning of the Granite State policy, during the policy period.

On remand, the trial court will need to review the factual record, and any additional evidence submitted, and determine whether evidence exists that contamination reaching MTCA remediation levels may yet occur, thus supporting the MTCA claim, and, if not, whether sufficient damage is shown to support a common law claim. If called upon, it may then revisit its rulings, in light of this opinion, and resolve the questions then presented.

C

We next address the trial court's grant of partial summary judgment as to the claims arising from sites at which the only damage was to Gull's own property. We affirm the trial court's ruling as to these sites.

In the trial court, Granite State moved for summary judgment dismissal of all claims arising from these sites, citing its policy's "owned property exclusion." "An owned property exclusion prevents a CGL policy from providing first-party benefits to the insured." Olds-Olympic, 129 Wn.2d at 478 (citing TODD I. ZUCKERMAN & MARK C. RASKOFF, ENVIRONMENTAL INSURANCE LITIGATION § 7.02, at 7-4 (Supp. 1994)). "Third party insurance involves protection for the policyholder for liability it incurs to someone else, while first party insurance involves protection for losses to the policyholder's own property." Olds-Olympic, 129 Wn.2d at 479 (citing Weyerhaeuser, 123 Wn.2d at 909).

Thus, to the extent that the trial court dismissed claims arising from sites at which the evidence established contamination only to soil owned by Gull, the

trial court properly ruled that the owned property exclusion applied. Property damage to those sites was not entitled to coverage under the policies. The claims were rightly dismissed.

X

Finally, Granite State argues that there is no justiciable controversy between the parties given the amount of money Gull has already obtained in settlement with other insurers and Gull's unknown future liability exposure. Gull responds, stating that it has already incurred $17 million in past liability and faces more than a dozen lawsuits and cleanup demands. Thus, it contends, it likely faces future exposure for years or even decades to come. Agreeing with Gull, the trial court ruled that "Gull's claim for declaratory judgment to establish Granite [State] owes it a duty to defend and a duty to pay losses stemming from covered occurrences at enumerated former station sites under Granite [State] policies in effect from 1980 to 1983 . . . is a justiciable controversy." We agree.

The Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, provides:

> A person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

RCW 7.24.020.

A justiciable controversy must exist in order to invoke a court's jurisdiction pursuant to the UDJA. Pasado's Safe Haven v. State, 162 Wn. App. 746, 759, 259 P.3d 280 (2011). To be justiciable, a claim must involve

> "(1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."

To-Ro Trade Shows v. Collins, 144 Wn.2d 403, 411, 27 P.3d 1149 (2001) (alteration in original) (quoting Diversified Indus. Dev. Corp. v. Ripley, 82 Wn.2d 811, 815, 514 P.2d 137 (1973)).[40] This requirement prevents a party from obtaining relief on hypothetical, speculative, or premature claims. Where these elements are not satisfied, a court risks issuing a prohibited advisory opinion. Bloome v. Haverly, 154 Wn. App. 129, 141, 225 P.3d 330 (2010) (quoting Branson v. Port of Seattle, 152 Wn.2d 862, 877, 101 P.3d 67 (2004)).

It is clear, based upon our holdings and conclusions herein, that a justiciable controversy remains.

Alternatively, Granite State asks this court (as it asked the trial court) to invoke its equitable authority to dismiss Gull's declaratory judgment action without prejudice, subject to what it contends should be Gull's exhaustion of a $16.7 million surplus of settlement payments already received. Gull, relying on Sorenson v. Pyeatt, 158 Wn.2d 523, 146 P.3d 1172 (2006), counters that Granite

---

[40] An exception to this requirement exists only in "'rare occasions where the interest of the public in the resolution of an issue is overwhelming.'" To-Ro, 144 Wn.2d at 416 (quoting In re Disciplinary Proceeding Against Deming, 108 Wn.2d 82, 122-23, 736 P.2d 639, 744 P.2d 340 (1987) (Utter, J., concurring)). The parties do not argue that this exception applies.

State must defeat its declaratory judgment claim based on principles of law, not equity.

In Sorenson, the court announced that "it is a fundamental maxim that equity will not intervene where there is an adequate remedy at law" and, in determining whether to exercise equitable powers, "Washington courts follow the general rule that equitable relief will not be accorded when there is a clear, adequate, and complete remedy at law." 158 Wn.2d at 543.

Given that Gull's declaratory judgment claim is justiciable, Granite State has not set forth sufficient grounds to warrant equitable relief.

Affirmed in part, reversed in part, and remanded.[41, 42]

WE CONCUR:

---

[41] We note that final judgment has not been entered in this case. Thus, all of the trial court's rulings remain interlocutory and are subject to revision by the trial court. "[T]he authority of trial courts to revisit interlocutory orders 'allows them to correct not only simple mistakes, but also decisions based on shifting precedent.'" Chaffee v. Keller Rohrback LLP, 200 Wn. App. 66, 76-77, 401 P.3d 418 (2017) (quoting United States v. Martin, 226 F.3d 1042, 1049 (9th Cir. 2000)). Accordingly, the parties are free to ask the trial court to revisit its rulings, in light of this opinion, if warranted. And the trial court is free to do so, even absent a request from the parties.

[42] This is an extremely complex case. Although we have revised several of the trial court's rulings, we wish to express our admiration for the obvious hard work and diligence the trial court has expended on this litigation so far.

Similarly, after reviewing the appellate briefing and the actions of the attorneys in the trial court, as reflected in the record presented, we wish to acknowledge the excellent work done by the lawyers herein. All parties are ably represented. That is clear—even when answers to the legal issues created by their imaginations and ingenuity are not.